# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2017, 8:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

Ey.H. & Et.H. (Minor Children),

and

A.W. (Father)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 30, 2017

Court of Appeals Case No.
11A01-1705-JT-1122

Appeal from the Clay Circuit Court

The Honorable Joseph D. Trout, Judge

Trial Court Cause Nos.
11C01-1607-JT-180
11C01-1607-JT-181

**Mathias, Judge.**

[1] The Clay Circuit Court terminated A.W.'s parental rights to his minor children, and A.W. appeals[1] raising two issues: 1) whether the Indiana Department of Child Services ("DCS") failed to prove that Ey.H. was removed from Father for the statutorily required length of time, and 2) whether the trial court's judgment terminating Father's parental rights to both children is supported by sufficient evidence.

[2] We affirm.

## Facts and Procedural History

[3] Et.H., born in April 2012, and Ey.H., born in July 2013, were removed from their mother in March 2015 because she tested positive for methamphetamine and failed to use car seats while transporting the children. Ey.H. also had a bruise on his arm and his elbow and a large red mark on his leg. Prior to the children's removal, on February 23, 2015, A.W. was arrested for and later charged with dealing and possessing methamphetamine. Ex. Vol., DCS Ex. A-26. The children were adjudicated Children In Need of Services ("CHINS")[2] and placed with their maternal great grandparents.

[4] During the CHINS proceedings, A.W. was named as Et.H.'s father, but another man, D.M., was named the alleged father of Ey.H. D.M. did not

---

[1] S.H. ("Mother") voluntarily relinquished her parental rights and is not an active party to this appeal.

[2] The children were adjudicated CHINS in Owen Circuit Court. The CHINS proceedings were subsequently transferred to the Clay Circuit Court.

participate in services because he denied paternity of Ey.H. A.W. was generally unable to participate in services because he was convicted of Level 5 felony dealing in methamphetamine in June 2015, and he was incarcerated at all relevant times. Before his incarceration, A.W. was involved in caring for both children, but the children have not had contact with A.W. since February 2015.

[5] On July 29, 2016, the DCS filed a petition to terminate A.W.'s rights to Et.H. On that same day, the DCS filed a petition to terminate Mother's, D.M.'s (alleged father), and any unknown alleged father's rights to Ey.H. The petition alleged that Ey.H. was removed from Mother on March 13, 2015. And the DCS was ordered to arrange paternity testing as to the alleged father, D.M., who continued to deny that he was Ey.H.'s father.

[6] While he was incarcerated, A.W. had minimal contact with DCS. He also chose not to participate in substance abuse programs. And although he enrolled in the CLIFF drug treatment program, A.W. voluntarily removed himself from it. A.W. also lost good time credit for fighting and other "write-ups."

[7] A.W. was released from prison on November 26, 2016, and was required to complete two years of probation. In December 2016, A.W. submitted to a paternity test to establish his paternity to Ey.H. The DNA test results established that A.W. was Ey.H.'s biological father and D.M. was dismissed from the proceedings.

[8] Upon his release from prison, A.W. failed to participate in supervised visitation with the children. He did not attend an appointment with DCS to set up

services. A.W. also tested positive for methamphetamine on January 5, 2017. After his positive drug screen, faced with the choice of moving to Odyssey House, a sober living facility, or returning to jail, A.W. chose Odyssey House. Treatment in the Odyssey House program is a minimum of six months, but can be longer. Children are not permitted to reside at Odyssey House.

[9] At the January 25, 2017 fact-finding hearing, A.W. had resided at Odyssey House for approximately one month. A.W. admitted that he was delinquent in paying his rent, and if his outstanding balance becomes too high, he would have to leave the facility and return to prison. A.W. did have a construction job earning nine dollars an hour when he was able to work. At the hearing, A.W. admitted that he had "made little effort" to see the children. Tr. p. 166.

[10] On March 2, 2017, the trial court accepted Mother's voluntary termination of her parental rights to the children. The trial court involuntarily terminated A.W.'s parental rights to both Et.H. and Ey.H. In its findings of fact, the trial court found that A.W.'s criminal history was significant, and recounted his 2013 conviction for theft, 2015 conviction for dealing in methamphetamine, continued drug use while on probation, and two revocations of probation. While he was incarcerated, A.W. failed to complete the CLIFF rehabilitation program, and he used methamphetamine on four occasions after his November 2016 release from the Putnamville Correctional Facility. A.W. was given prior opportunities to address his methamphetamine addiction but refused to do so. A.W. also had the opportunity to participate in services while he was incarcerated and after his release from prison, but he failed to do so.

[11] The Court Appointed Special Advocate ("CASA") testified that it was in the children's best interests for the court to terminate A.W.'s parental rights to the children. The CASA believed that "continuing the parent-child relationship between [A.W.] and Child would be harmful to Child due to [A.W.'s] continued criminal involvement, continued substance abuse, lack of effort to utilize services, and inability to provide stability." Appellant's App. II p. 11; Appellant's App. III, p. 21. The CASA also testified that the children are doing well with their great-grandparents who provide "fantastic care" for the children. Tr. p. 125.

[12] Ultimately, the trial court found that A.W. had not had any significant involvement in the children's lives while incarcerated or after his release from prison. "Instead of hitting the ground running upon his release from incarceration, he relapsed and returned to methamphetamine use on four occasions and the illegal use of alcohol which are and could be grounds for revocation of his probation once again[.]" Appellant's App. II p. 13; Appellant's App. III, p. 23. And on March 2, 2017, the trial court entered orders terminating A.W.'s parental rights to Et.H. and Ey.H. Father now appeals.

## Discussion and Decision

[13] We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights when the parents

are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, the parents' interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[14]  The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

The burden is on DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1260. If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b).

When we review a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We neither reweigh evidence nor judge witness credibility. *E.M.*, 4 N.E.3d at 642. Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best*, 941 N.E.2d 499, 503 (Ind. 2011) (citations omitted).

## *I. Removal*

[17] A.W. argues that the DCS failed to prove that Ey.H. was removed from him for at least six months under a dispositional decree or that Ey.H. was removed for at least 15 months of the most recent 22 months as required by Indiana Code section 31-35-2-4(b)(2)(A). Throughout the CHINS and much of the termination proceedings, D.M. was Ey.H.'s alleged father, and D.M. was named as the alleged father in the dispositional decree. A.W. was only named as the alleged father in the dispositional decree concerning Et.H. Because A.W. was not named as the alleged father in the dispositional decree concerning Ey.H., *see In re G.M.*, 71 N.E.3d 898, 903–04 (Ind. Ct. App. 2017), we consider only whether Ey.H. was removed for at least 15 of the most recent 22 months.

[18] DCS removed Ey.H. from Mother's home on March 13, 2015, and over sixteen months later, it filed a petition to terminate D.M.'s and any unknown alleged father's parental rights on July 29, 2016. Ey.H. was therefore removed for over sixteen consecutive months between the date of removal and the date the petition was filed.

[19] Father argues that Ey.H. was not removed from him until his paternity was established in December 2016. This same argument was raised in *In re A.G.*, 45 N.E.3d 471 (Ind. Ct. App. 2015), *trans. denied*. In that case, on the date the child was removed, his father was unknown. Mother gave the DCS the names of two possible fathers. The man who was later determined to be the father via genetic testing was incarcerated when the child was removed. Approximately fourteen months after the child was removed and one week after paternity was

established, the DCS filed a petition to terminate both Mother and Father's parental rights. Father was later dismissed from the initial petition to terminate, but that same day, the DCS filed a separate petition to terminate his parental rights. The fact-finding hearing was held the following day. The child, who was eighteen-months old on the date of the fact-finding hearing, had been removed from his parents for his entire eighteen months of life.

[20] The trial court terminated Father's parental rights and he appealed. Father argued that "he only knew with certainty that A.G. was his child for approximately four months before the termination hearing, and therefore, DCS did not meet the first statutory requirement for removal." *Id*. at 476. Our court observed that only subsection 31-35-2-4(b)(2)(A)(iii) applied and the State was "required to prove two things: (1) the child was removed from the parent and (2) the child was under the supervision of the agency for at least fifteen of the most recent twenty-two months." *Id*.

[21] First, we concluded that the child was constructively removed from Father because Father was incarcerated shortly after the child was removed from Mother. *Id*. at 476–77 (concluding that due to his incarceration, "DCS had no choice but to continue placement outside Father's home"). And it was also undisputed that the child was placed with foster parents for eighteen consecutive months before the date of the termination hearing. But Father argued that "the duration of removal should be calculated based on the date that A.G. was removed from him. Specifically, he contended that 'the date the child is removed from the home' should be read as requiring removal from

Father's home for the purpose of calculating the required fifteen months." *Id.* at 477 (quoting I.C. § 31-35-2-4(b)(2)(A)(iii)).

[22]     Our court rejected Father's interpretation of the statute and concluded that "the focus of the inquiry is the length of time the child has been in temporary custody, not the length of time the child was removed from a particular parent." *Id.* at 478. "The fifteen-month requirement for filing a termination petition serves the 'State's very legitimate interest in promoting adoptions of children who have been removed from their parental home for extended periods of time,' instead of endless foster care placements."[3] *Id.* (quoting *Phelps v. Sybinsky*, 736 N.E.2d 809, 818 (Ind. Ct. App. 2000), *trans. denied*).

[23]     In this case, Ey.H. was constructively removed from A.W. on March 13, 2015, when he was removed from Mother and was not able to be placed with A.W. due to his incarceration. Over sixteen months later, on July 29, 2016, the DCS filed a petition to terminate A.W.'s rights to Et.H., and a petition to terminate

---

[3] In *Matter of G.M.*, 71 N.E.3d 898 (Ind. Ct. App. 2017), our court considered the statutory requirement for removal, and we reversed the order terminating the father's parental rights because the child was not removed from his care under a dispositional decree for at least six months. In a footnote, our court observed that

> This issue is dispositive as to Father because DCS was required to prove Child had been removed from his care for at least six months or Child had been removed from his care for fifteen of the last twenty-two months as required by Indiana Code Section 31-35-2-4(b)(2)(A)(iii), and the juvenile court concluded DCS did both. However, in its brief, DCS conceded it did not meet the fifteen month criteria, *as it filed its petition to terminate Parents' rights when Child had been removed for one year, two months, and twenty-four days.*

*Id.* at 904, n. 2 (emphasis added).

Mother's, D.M.'s (alleged father), and any unknown alleged father's rights to Ey.H. Therefore, although A.W's paternity to Ey.H. had not been established when the termination petition was filed, the DCS proved that over sixteen consecutive months elapsed between the date Ey.H. was removed from the his parent's home and the date DCS filed its petition to terminate parental rights.[4] *See In re A.G.*, 45 N.E.3d at 478.

## II. Conditions for Removal Will Not Be Remedied

[24] As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). Although the trial court found that both prongs had been proven, we consider only whether clear and convincing evidence supports the trial court's conclusion that "there is a reasonable probability that the conditions that resulted in the child[ren]'s removal or the reasons for placement outside the home of the parents will not be remedied." Ind. Code § 31-35-2-4(b)(2)(B)(i); Appellant's App. Vol. II, pp. 12–13; Appellant's App. Vol. III, pp. 12–13.

[25] When we review this determination, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must

---

[4] We also observe that A.W. was involved in caring for both of the children before their removal and suspected that he was Ey.H.'s father before D.M. was eliminated as the child's biological father. Tr. p. 173.

determine what conditions led to the child's removal. *Id.* And then we consider "'whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)). The trial court must evaluate a parent's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *Id.*

[26] For nearly the entire duration of the CHINS and termination proceedings, A.W. was incarcerated for dealing in methamphetamine. Although the children were not removed from A.W.'s home, they were constructively removed from his home by virtue of his incarceration. Upon his release from incarceration, A.W. used methamphetamine on four occasions, and he has not addressed his addiction. After he was released from prison, A.W. also failed to attend a scheduled appointment with DCS to set up services, and as a result, he has not seen the children since his arrest in February 2015.

[27] A.W. acknowledges his addiction issues but has taken few steps to address his addiction. He places significant emphasis on his placement at Odyssey House, but he elected that placement in lieu of returning to jail for violating his probation by using methamphetamine.

[28] A.W. cites to three recent cases from our supreme court involving incarcerated parents where the court preserved the parent's parental rights. In *In re G.Y.*, the

mother was incarcerated and upon release would have to complete numerous services before reunification with her child. 904 N.E.2d 1257 (Ind. 2009). However, she was bonded with the child, had visitation with the child during her incarceration, had not used cocaine in several years, demonstrated commitment to reunification with her child from the date of her arrest, and was participating in several programs while incarcerated to better herself as a person and a parent. In *In re J.M.*, the parents were incarcerated but had participated in services while in prison to address their addictions, the mother had completed her bachelor's degree, and the father made arrangements for employment and housing upon his release from incarceration. 908 N.E.2d 191 (Ind. 2009). In *In re K.E.*, the father had completed several programs while incarcerated related to self-improvement, parenting, and drug and alcohol abuse. 39 N.E.3d 641 (Ind. 2015). The child was bonded with father, who regularly visited with the child and made nightly phone calls to speak with him. The father also had established a place to live and possible future employment upon his release from incarceration. *Id*. *See also In re M.W.*, 943 N.E.2d 848 (Ind. Ct. App. 2011) (reversing termination of incarcerated father's parental rights), *trans. denied.*

[29]     The facts and circumstances of those cases are markedly different from those in this appeal. A.W. failed to avail himself of programing and classes available to him while he was incarcerated, such as the CLIFF program. A.W. does not have a bond with the children and has not seen them for nearly two years. A.W. is employed part-time but was required to reside at Odyssey House for at least five additional months after the termination hearing, and children are not

permitted to reside there. Finally, after he was released from incarceration, A.W. failed to attend a scheduled appointment with DCS to set up services and used methamphetamine four times. A.W. has made no effort toward reunification with the children. For all of these reasons, we conclude that clear and convincing evidence supports the trial court's finding that the conditions that resulted in the children's removal will not be remedied.

### III. Best Interest of the Children

[30] Finally, A.W. argues that the trial court's conclusion that termination of his parental rights was in the children's best interests is clearly erroneous. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the juvenile court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[31]     A.W. was released from incarceration on November 23, 2016. Two months elapsed between his release from incarceration and the fact-finding hearing. A.W. admitted that during those two months his communication with DCS was minimal. A.W. admitted that he abandoned the children prior to their removal and left them with their mother, who he described as an addict and "not a good mother." Tr. pp. 166–67. Shortly before the fact-finding hearing, A.W. was faced with the choice of returning to prison because he violated his probation by using methamphetamine on four occasions or residing at Odyssey House. He chose Odyssey House and claims he finally wants to address his substance abuse and addiction issues.

[32]     Ultimately, A.W. may be successful in attaining that goal. But after reviewing A.W.'s history of drug use and incarceration, the trial court concluded otherwise. A.W. has not seen the children in almost two years, and there is no bond between them. A.W. has not been able to provide the children with a stable home life, and even if he remains sober, he will be unable to do so for several months. And the CASA believed that terminating A.W.'s parental rights was in the children's best interests. The CASA testified that "continuing the parent-child relationship between [A.W.] and Child would be harmful to Child due to [A.W.'s] continued criminal involvement, continued substance abuse, lack of effort to utilize services, and inability to provide stability." Appellant's App. II p. 11; Appellant's App. III, p. 21. Moreover, the children are doing well in their placement with their great-grandparents.

[33] For all of these reasons, we conclude that the DCS proved by clear and convincing evidence that terminating A.W.'s parental rights was in the children's best interests.

## Conclusion

[34] We affirm the trial court's order terminating A.W.'s parental rights to Et.H. and Ey.H. DCS proved that Ey.H. was removed from A.W. for the requisite time period, that the conditions that resulted in the children's removal will not be remedied, and that termination of A.W.'s parental rights was in the children's best interests.

[35] Affirmed.

Vaidik, C.J., and Crone, J., concur.